AUSA Michael Donovan (312) 886-2035
AUSA Maggie J.Schneider, (312) 353-1875

FILED
JUN 2 8 2010 NF
Jun 28 2010
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JAMES WODNICKI

**UNDER SEAL**

CRIMINAL COMPLAINT

CASE NUMBER: 10 CR 0548

MAGISTRATE JUDGE SCHENKIER

I, Special Agent Craig Henderson, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

Beginning on or about July 19, 2006, and continuing until on or about July 20, 2006 at Chicago, in the Northern District of Illinois, Eastern Division, James Wodnicki, defendant herein,

did attempt to commit extortion affecting commerce, in that he attempted to obtain and obtained United States currency from another person, with that person's consent induced under color of official right, and by the wrongful use of fear of economic harm;

in violation of Title 18 United States Code, Section 1951.

I further state that I am a Special Agent of the Federal Bureau of Investigation and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof: X Yes _ No.

Signature of Complainant

Sworn to before me and subscribed in my presence,

June 28, 2010 at Chicago, Illinois
Date City and State

SIDNEY I. SCHENKIER, U.S. MAGISTRATE JUDGE
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS )
) ss
COUNTY OF COOK )

AFFIDAVIT

I, Craig Henderson, being duly sworn, depose and state:

1. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately sixteen years, having been assigned to the Chicago Division for twelve and a half years, and the FBI Laboratory Division for three and a half years. While assigned to the Chicago Division, I have been part of an Organized Crime Squad and a White Collar Crime/ Public Corruption squad, and have investigated violations of federal statutes, including wire fraud, mail fraud, money laundering and extortion.

2. I, along with FBI Special Agents and other task force officers, have been conducting an investigation regarding violations of Title 18, United States Code, Section 1951. I am familiar with the facts and information contained in this Affidavit, which is based on my own personal observations, witness interviews, interviews of cooperating witnesses ("CWs"), review of consensually recorded conversations, review of calls intercepted pursuant to Court order, analysis and review of documents and records, and from discussions with, among others, FBI special agents ("agents") and Chicago Police Department ("CPD") - Internal Affairs Division ("IAD") investigators.

3. This Affidavit is made in support of a criminal complaint

charging JAMES WODNICKI ("WODNICKI") with violation of Title 18, United States Code, Section 1951, in that he did attempt to commit extortion affecting commerce, in that he attempted to obtain and obtained United States currency from another person, with that person's consent induced under color of official right, and by the wrongful use of fear of economic harm.

4. Since this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe WODNICKI committed violations of Title 18, United States Code, Section 1951.

## I. BACKGROUND

5. FBI special agents in Chicago have been conducting an investigation into extortion by, and bribery of, CPD officers within the City of Chicago, Illinois. Based on information provided by cooperating witnesses, and complaints received by the CPD IAD, the FBI learned that certain tow truck companies and their drivers operating in Chicago made bribe payments to CPD officers in return for receiving the opportunity to tow vehicles from accident scenes and collect resulting tow fees. The bribes included cash payments of between $50 to $400 per vehicle towed, and auto repair and

other services given to CPD officers by towing business operators.

6. WODNICKI was a Chicago police officer assigned to the CPD's 14th District, and his regular duty assignment was beat 1434. In the course of his duties, WODNICKI was assigned to handle traffic accident scenes and traffic enforcement duties. On those occasions when he handled accident scenes, WODNICKI would be assigned accident scenes via the CPD radio system or by computer.

7. Based on information from a confidential witness ("CW1") it was learned that WODNICKI requested and received cash bribe payments from certain tow truck operators in exchange for preferential treatment at accident scenes occurring in the CPD's 14th District.[1] Furthermore, investigation has shown that WODNICKI often contacted Tow Driver A via a cellular telephone when an accident occurred in the CPD 14th District in order for Tow Driver A to respond to the scene first.[2]

---

[1] The CPD14th District is also known as the Shakespeare District, and its station is located at 2150 N. California, Chicago, Illinois. The CPD boundaries for the 14th District are roughly: Belmont Avenue on the north, north branch of the Chicago River on the east, Division Street on the south and Central Park Avenue on the west.

[2] Tow Driver A is a tow truck operator who operated a business, Tow Company A, exclusively in the CPD 14th District. Tow Driver B was a tow truck driver who was employed by Tow Driver A. During the investigation, Tow Driver A received telephone calls from WODNICKI in which WODNICKI directed Tow Driver A to respond to accident scenes in the CPD 14th District that were assigned to WODNICKI.

8. According to CPD rules and regulations, specifically Rules 45 and 46, CPD officers are prohibited from recommending any commercial or professional service (Rule 45) or advising any person engaged in a professional or commercial service that any commercial or professional service may be needed (Rule 46). Therefore, these rules prohibit CPD officers from recommending that victims of vehicular accidents utilize specific towing companies, and prohibit the officers from contacting towing businesses regarding potential business at vehicle accident scenes.

## II. INFORMATION FROM CW1

9. In or about December 2005, CW1 began to provide information about the "tows-for-money" bribery scheme occurring in the CPD 25th District and other CPD districts.[3] The information provided by CW1 has been corroborated and proved reliable by consensual recordings, other cooperating witnesses, physical surveillance and telephone records. CW1 was identified based on complaints CW1 filed with the CPD IAD regarding the officers who

[3] CW1 is a tow truck driver and owner of a towing business operating in the Chicago area. CW1 has received monetary compensation for the information he/she has provided to law enforcement in this investigation. This monetary compensation was for services provided by CW1 while assisting the FBI. At this time, I am unaware of any criminal history associated with CW1. CW1 has filed complaints with CPD's IAD about officers regarding traffic and/or parking tickets written on CW1's vehicles in what CW1 perceived to be retaliation directed against CW1. Information provided by CW1 has proven reliable and has resulted in the arrests of five subjects of this investigation.

were demanding bribes in exchange for tows in the CPD 25th District. CW1 related that CW1 lost business at accident scenes in the CPD 25th District because CW1 would not participate in the tows-for-money bribery scheme occurring there.

10. According to CW1, in April 2006, Tow Driver A and CW1 developed a towing business relationship. Tow Driver A operated Tow Company A and was looking for someone who owned tow trucks so he could expand his business. Tow Driver A approached CW1 to join in a business relationship in the CPD 14th District. Tow Driver A told CW1 that he had certain CPD 14th District officers on his payroll, who were providing Tow Driver A preferential treatment at accident scenes in return for monetary bribes. According to CW1, Tow Driver A showed CW1 his cellular telephone with the names and or beat tags of each officer as well as their contact telephone numbers. Tow Driver A told CW1 how much he paid each officer or how much each officer expected to be paid per vehicle towed from accident scenes. Finally, it was understood between Tow Driver A and CW1 that CW1 would be the day-to-day manager of the towing business relationship because CW1 had a towing storage lot. Furthermore, as CW1 had an established business, CW1 would be the one to handle the money and also pay the bribes to the police officers. Tow Driver A would be in charge of the day-to-day

street operation.

11. According to CW1 and as corroborated by recorded conversations and other information developed during the investigation, some officers in the 14th District of the CPD required payments from Tow Driver A and other tow truck drivers in return for directing vehicle tows to those drivers at accident scenes occurring in the CPD's 14th District. WODNICKI provided vehicle tows to Tow Driver A and CW1 in various ways. On at least one occasion WODNICKI was assigned to, and in charge of, an accident scene at which he ordered a tow driver from another company to leave the scene. On other occasions, WODNICKI simply telephoned Tow Driver A to inform him of an accident scene and Tow Driver A would arrive before tow drivers from other companies. In exchange for providing CW1 or Tow Driver A and others with vehicle tows, WODNICKI demanded a payment from them, which payment was related to the number of vehicles WODNICKI had provided for them to tow.

12. During the course of this investigation, the government applied for and received authorization to intercept wire communications to and from Tow Driver A's cellular telephone number (312) 217-6645 ("Target Telephone 1") pursuant to Orders signed by Chief Judge James F. Holderman on July 24, 2006 and August 18, 2006; signed by Acting Chief Judge David H. Coar on

September 15, 2006; and signed by Chief Judge James F. Holderman on October 13, 2006. Unless otherwise noted, the calls described herein were intercepted pursuant to these Court Orders.[4]

## III. VEHICLE REPORTS FOR A STOLEN TOYOTA

13. On or about July 17, 2006, at approximately 11:04 a.m., Individual A reported to CPD that his white 1992 Toyota Celica, Illinois license plate number 800XXXX had been stolen. Individual A stated that the theft took place on or about July 14, 2006 in the area of North May Street, Chicago, Illinois. The CPD incident report had a Records Division number of HM-480804 to document the theft. The insurance company listed in the report for the stolen vehicle is GEICO.

14. A check of the Illinois Secretary of State database for Illinois license plate 800XXXX, shows the vehicle to be registered to Individual A. The vehicle was registered as a white, 1992 Toyota coupe.

---

[4] At various points in the Affidavit, I will offer my interpretations of certain intercepted conversations or recorded meetings in brackets and otherwise. My interpretations of these conversations are based on my knowledge of the investigation to date and review of prior interceptions, the contents and context of the conversations, prior and subsequent conversations, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations generally. Moreover, the voice identifications for the conversations set out below are preliminary. The identification of some individuals involved in these conversations and meetings has not yet been completed. Some of these summaries do not include references to all the topics covered during the course of the conversations. In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned. For these recordings, I have relied on draft – not final – transcripts of conversations.

15. On or about July 19, 2006, at approximately 1:13 p.m., according to the Office of Emergency Management and Communications (OEMC), Individual A called the OEMC to report that he had found his previously reported stolen Toyota Celica, in the area of 1735 N. Ashland Avenue, Chicago, Illinois. Individual A made a second call to OEMC at approximately 1:52 p.m., stating that he was still awaiting the arrival of the CPD. OEMC records indicate the call was initially dispatched to CPD Beat Car 1434 at approximately 1:50 p.m. CPD Beat Car 1434 acknowledged receipt of the call at approximately 1:50 p.m.

16. A review of OEMC Police Computer Aided Dispatch (PCAD) records revealed that the CPD member assigned to work Beat 1434 on July 19, 2006, during this time period, was signed on to a portable police computer which required a unique log-on identity and password. According to CPD records, the log-on identity associated with this computer was assigned to CPD police officer WODNICKI of the CPD 14th Police District. WODNICKI, working Beat 1434, reported that he was finished with the assignment for scene of the stolen Toyota (event HM-480804) at 2:44 p.m., and provided a disposition for the assignment of a "19 P," which indicates a miscellaneous service being provided for the assignment.

17. A review of a CPD Recovered Vehicle Supplementary Report for event HM-480804 revealed that the report was authored by WODNICKI on July 19, 2006. The report documented the recovery of a stolen Toyota Celica, Illinois license plate 800XXXX. According to the report, WODNICKI recovered the vehicle at 2:00 p.m. at 1730 N. Ashland Avenue, Chicago, Illinois, on the street. The report indicates

that the vehicle was found by the owner, Individual A, and the vehicle had sustained damage to the body and front wheel. WODNICKI completed his investigation at 2:45 p.m. and submitted his report for approval.

## IV. WODNICKI GIVES THE TOW OF THE STOLEN TOYOTA TO TOW DRIVER A and CW1.

18. As set forth above, at approximately 1:50 p.m. on July 19, 2006, WODNICKI, assigned to CPD Beat Car 1434, acknowledged receipt of the call relating to the stolen to Toyota.

19. On or about July 19, 2006, from approximately 2:01 p.m. until 3:24 p.m., CW1, acting at the direction of the FBI with a recording device provided by the FBI, consensually recorded conversations between CW1, Tow Driver A, WODNICKI and other unknown persons.[5] During this consensually recorded

[5] The voice identification of Tow Driver A has been accomplished as follows: calls intercepted over telephones pursuant to court orders in this investigation in which Tow Driver A was one of the speakers were compared to the voice of Tow Driver A in recordings made by CW1 while agents observed CW1 meet with Tow Driver A. In addition, agents interviewed Tow Driver A on May 5, 2010 and were able to confirm their identification of the voice of Tow Driver A at that time. The voice of WODNICKI was identified by SA Henderson through the following means: On November 2, 2006, WODNICKI , Tow Driver A and CW1 met at the park located at Palmer and Albany streets, Chicago, Illinois. WODNICKI was in uniform and driving a Chicago Police Department patrol car bearing bet tag 1434. CW1 recorded the conversation with WODNICKI and Tow Driver A. SA Henderson conducted a surveillance of this meeting. SA Henderson reviewed the recording of the meeting and can attest to the voices on the consensual recording as CW1, Tow Driver A and WODNICKI. SA Henderson has compared the voice of WODNICKI on that recording to the calls set forth in this affidavit and has determined that the voice attributed to WODNICKI in those calls is the same as the voice of WODNICKI captured in the recording of the meeting.

conversation, at approximately 2:04 p.m., a telephone ringing sound was recorded.[6]

The following is a portion of the recorded conversation:

(Telephone ringing)

| | |
|---|---|
| Tow Driver A: | ....this guys a fucking joke, here's another dickhead. [Nextel direct connect sound is heard] |
| CW1: | Who's that? |
| Tow Driver A: | Woodwick [WODNICKI]. What's up buddy? Hell yeah I do. |

[In the following conversation, WODNICKI's voice was captured on CW1's recording device because it was broadcast over the speaker of Tow Driver A's telephone.]

| | |
|---|---|
| Tow Driver A: | Well, where are you at though? |
| WODNICKI: | ...(UI) this recovery I got over here with an accident...(UI) |
| Tow Driver A: | Well, where you at? |
| WODNICKI: | ...about, uh...(UI) thirty on Ashland avenue.... |
| Tow Driver A: | Alright, cool, give me, uh ten minutes, by the time I work myself up that way. |
| WODNICKI: | Alright...(police dispatcher talking over WODNICKI) |
| Tow Driver A: | He has a Geico (car insurance) over there. Stolen car, let me take a ride over there first. |
| CW1: | Where, where, where? |
| Tow Driver A: | Um...16...1630 Ashland. |
| CW1: | Want me to ride with you? |
| Tow Driver A: | North and Ashland. No problem. |
| CW1: | I follow you. |

20. Later during the same recorded conversation, at approximately 2:22 p.m., CW1 arrived at the scene where the stolen Toyota was located, exited CW1's vehicle and engaged in conversation with WODNICKI and Tow Driver A. A short time later, Individual A agreed to have Tow Driver A tow the stolen Toyota to a body shop. Tow Driver A towed the Toyota to a body shop while CW1 gave

[6] On or about July 19, 2006, at approximately 2:03:59 p.m., analysis of data from a court authorized pen register for Target telephone 1, showed an incoming call to Target Telephone 1 from 773-719-7916, a number subscribed to and utilized by WODNICKI. The duration of this call was approximately 28 seconds.

Individual A a ride to the body shop in CW1's vehicle.

## V. JULY 20, 2006 ATTEMPTED EXTORTION

21. A review of pen register data on July 20, 2006, for Target Telephone 1, revealed numerous contacts with telephone number 773-719-7916, the cellular telephone subscribed to and used by WODNICKI. Target Telephone 1 received incoming calls from 773-719-7916 at 8:36 a.m., 8:44 a.m. and 9:03 a.m. These calls had durations of seven seconds, nine seconds, and three seconds respectively. At 9:46 a.m., Target Telephone 1 received an incoming call from 773-719-7916 which lasted for 2 minutes and 23 seconds. At 11:07 a.m., Target Telephone 1 received an incoming call from 773-719-7916. This call had a duration of 23 seconds.

22. On or about July 20, 2006, at approximately 12:38 p.m., CW1, acting at the direction of FBI agents with a recording device provided by the FBI, consensually recorded a conversation with Tow Driver A, WODNICKI and other unknown persons. Prior to making this recording, CW1 and his vehicle were searched for the presence of excess currency with negative results. CW1 was also provided with $500 in United States Currency by the FBI in order to pay bribe payments, one of which was to be given to WODNICKI. After the meeting, CW1 advised agents that the only payment made that day was to WODNICKI and he/she returned $350 to FBI agents. During the recorded conversation, CW1 and Tow Driver A discussed paying WODNICKI. The following is a partial summary of the conversation:

| | |
|---|---|
| Tow Driver A: | Do you want to take care of Jim (WODNICKI) first before we pick up that car? |
| CW1: | Yeah, let's take care of Jim (WODNICKI) before go (pause in conversation). Yes sir (pause). |

23. Later in the same recording, at approximately 12:55p.m., Tow Driver A and CW1 met with WODNICKI. WODNICKI told Tow Driver A and CW1 about a vehicle crash in the area of Fullerton and Damen in Chicago, Illinois. The following is a partial summary of the conversation:

| | |
|---|---|
| CW1: | There's Jim (WODNICKI) right there. What's up Jim (WODNICKI)? |
| WODNICKI: | (UI). |
| CW1: | Well, thank you. |
| WODNICKI: | I'm going to sit ...(UI), I got a call for another accident...a three car crash. Alright, go over man, like I said, hopefully fucking [Tow Company C] ain't over there and shit. Let's go over there, there's fucking three of 'em now. |
| CW1: | Yeah, yeah, where we going? |
| WODNICKI: | Fullerton and Damen. |

24. Later in the conversation, at approximately 1:08 p.m., CW1, Tow Driver A and WODNICKI arrived at the scene of the vehicle crash. WODNICKI needed help determining where one of the involved parties lived, and Tow Driver A assisted WODNICKI in obtaining that information.

25. Later in the same recorded conversation, at approximately 1:57 p.m., Tow Driver A directed CW1 on how to pay WODNICKI. Tow Driver A and CW1 then met with WODNICKI in the parking lot of the CPD 14th District station to make a bribe payment to him. The following is a portion of that recorded conversation:

| | |
|---|---|
| CW1: | (UI) Jimmy got him though . . . |

| | |
|---|---|
| Tow Driver A: | [nickname of Tow Driver C] says the only thing he wants is to help him out bro'. You know what I'm saying? Remember pa..palm of your hand [put the bribe money in the palm of your hand] Joe. |
| CW1: | I know, I know. I'm, I'm gonna try to get better, bro'. So nobody sees, you know what I'm saying? |
| Tow Driver A: | Right. |
| CW1: | Let me fold it [the cash bribe] up in here. A hundred and fifty [$150], right? |
| Tow Driver A: | Yes sireee Bobbo. |
| CW1: | Don't worry, I'll get better at this, kid. I'm not used to this shit. |
| Tow Driver A: | (Singing)…and they saw you puppy love… |

A short time later during the same recording, the following conversation occurred:

| | |
|---|---|
| CW1: | …and Mister Jim. |
| WODNICKI: | What's a matter with your stomach, [nickname for Tow Driver A]? |
| Tow Driver A: | What… |
| WODNICKI: | You get shot or something… |
| Tow Driver A: | Operation… |
| CW1: | (laughs) Operation, operation number nine. I like that, that tone Jim. |

A short time later, at approximately 2:00 p.m., during the same recording, the following conversation occurred:

| | |
|---|---|
| Tow Driver A: | This guy wants to feel your hand, bro'. |
| WODNICKI: | (laughing) Okay. |
| CW1: | Thanks a lot Mike.[7] |
| WODNICKI: | Alright. |
| CW1: | I appreciate it Mike. |
| Tow Driver A: | Mike, Jim. |
| WODNICKI: | (laughing) |

[7] According to CW1, at the time he said "Thanks a lot Mike" he shook WODNICKI's hand with $150 concealed in his palm. WODNICKI took the $150 during the handshake. CW1 stated that he accidentally called WODNICKI "Mike" rather than Jim, as is clear from the conversation immediately following the payment.

| | |
|---|---|
| CW1: | Oh, Mike, I just called you Mike, it's Jim, it's Jim, it's Jim. |
| WODNICKI: | Call me whatever. |
| CW1: | I appreciate it buddy. |
| WODNICKI: | (police radio in background) Fuckin eh, man. That kid [Individual A] was kinda goofy though. |
| CW1: | Which one? |
| WODNICKI: | That one yesterday [Individual A] . . . with the fuckin Toyota [the stolen vehicle]. |
| Tow Driver A: | He was a goof. We took the fuckin car to fuckin [name of body shop] |
| WODNICKI: | Yeah... |
| Tow Driver A: | We go to fuckin four-fifty [name of body shop] looked. [name of body shop] looked at the fuckin car and said I don't want the fuckin car. |
| WODNICKI: | Yeah, cause they know they probably won't get their money...and I'll, I'll bet you Geico is gonna total that fuckin thing. |
| Tow Driver A: | It is a total. So far... |
| CW1: | It's a nineteen like ninety-two Toyota. |
| WODNICKI: | It's a ninety-two. |
| CW1: | It's a ninety-two, you know what I'm saying Jim? It's it's... |
| WODNICKI: | And he... |
| CW1: | But he [owner of the Toyota] was being persistent, that's the funny part. Is that he was being persistent that he wanted to take it in. |
| WODNICKI: | Yeah... |

## VI. WODNICKI REFERS TOW DRIVER A TO ACCIDENT SCENES

26. After this bribe payment occurred, WODNICKI continued to call Tow Driver A and direct Tow Driver A to accident scenes within the CPD 14th district.

27. For example, on or about July 28, 2006 at approximately 12:38 p.m. (Call 424), Tow Driver A, using Target Telephone 1 received an incoming call from WODNICKI, who was using telephone number 773-719-7916, a number subscribed to WODNICKI. During the recorded call, the following conversation occurred:

| | |
|---|---|
| Tow Driver A: | What's up buddy? |

| | |
|---|---|
| WODNICKI: | Yeah, I don't know if you heard that accident, right there at Cortland and Elston. |
| Tow Driver A: | No. |
| WODNICKI: | I don't know, I don't know, if you'd want to go up there, cause I don't know if [name of another tow driver]'s guy would be there already. |
| Tow Driver A: | Let me check. |
| WODNICKI: | They said it's an accident at 1901, ah, Elston at Cortland right there. |
| Tow Driver A: | Let me go, let me go check it out right quick. |
| WODNICKI: | Alright. |
| Tow Driver A: | Alright thanks. |
| WODNICKI: | Bye. |

28. On or about August 4, 2006 at approximately 12:55p.m. (Call 1331), Tow Driver A, using Target Telephone 1, received an incoming call from WODNICKI who was using telephone number 773-719-7916, a number subscribed to WODNICKI. WODNICKI identified himself to the CPD dispatcher by his beat number "three four" meaning 1434. During the recorded call, the following conversation occurred:

| | |
|---|---|
| WODNICKI: | Yeah three four, go ahead. [Dispatcher can be heard over WODNICKI's radio] |
| Tow Driver A: | What's up buddy? |
| WODNICKI: | Yeah, hang on, they're calling me . . . [WODNICKI answers dispatcher "Diversey and Western alright"] |
| Tow Driver A: | You got an accident? |
| WODNICKI: | Yeah, they just gave me an accident Diversey and Western. |
| Tow Driver A: | Diversey and Western? |
| WODNICKI: | That's what he said. |
| Tow Driver A: | I'll meet you, I'll meet you over there. |
| WODNICKI: | Alright. |
| Tow Driver A: | Alright. |

29. On or about August 17, 2006 at approximately 9:34 a.m. (Call 2687), Tow Driver A, using Target Telephone 1 received an incoming call from telephone

number 773-719-7916, a number subscribed to and used by WODNICKI. WODNICKI told Tow Driver A of a truck stuck under a viaduct before it was announced by the CPD dispatcher. During the recorded call, the following conversation occurred:

| | |
|---|---|
| Tow Driver A: | What's up buddy? |
| WODNICKI: | Hey, are you working? |
| Tow Driver A: | Um, I should be in my truck in the next five, ten minutes. What's up? |
| WODNICKI: | Alright. I don't know if they, I don't know if they called in yet or not, I'm on my way to a fire right now, but there's a truck under the viaduct on North Avenue with its top ripped all the way open man. |
| Tow Driver A: | At North Avenue and what? |
| WODNICKI: | North and the Kennedy, right here. |
| Tow Driver A: | Alright let me, let me get somebody over there right quick. Alright? |
| WODNICKI: | Yeah, alright cool man. I gotta get to this fire, these jagoffs ain't getting' outta my way here. |
| Tow Driver A: | Alright, cool, thank you buddy. |

30. On or about August 19, 2006 at approximately 10:32 a.m.(Call 2920), Tow Driver A, using Target Telephone 1 received an incoming call from telephone number 773-719-7916, a number subscribed to and used by WODNICKI. WODNICKI told Tow Driver A about an accident in the CPD 14th District. The following is a summary of the telephone call:

| | |
|---|---|
| Tow Driver A: | What's going on buddy? |
| WODNICKI: | Yeah, did you hear that? |
| Tow Driver A: | What? |
| WODNICKI: | North and Throop man, I gotta an auto accident. |
| Tow Driver A: | Man, I'm on my way to Illinois Masonic to take my wife. |
| WODNICKI: | Oh, alright. |
| Tow Driver A: | Well let me, let me send my driver over there because my driver should be out there. |
| WODNICKI: | Alright, let him know. |

Tow Driver A: Alright cool.
WODNICKI: Alright.
Tow Driver A: Bye.

## VII. INTERSTATE NEXUS

31. The tow truck used by CW1 and Tow Driver A was a 2001 GMC Tow Truck that was manufactured in Mexico, specifically at the Assembly plant in Toluca, Mexico. The vehicle tow lift for this tow truck is a Vulcan/Century, produced by Miller Industries Towing Equipment, 8503 Hilltop Drive, Ooltemah, TN 37363. Additionally, CW1 maintained vehicle insurance for CW1's tow trucks with Progressive Insurance, which maintains offices and conducts business outside of Illinois. Also, at times relevant to the events described herein, CW1 mailed premium payments to Progressive Insurance from the Chicago, Illinois area to Delaware.

## VII. CONCLUSION

32. Based on the aforementioned, I believe there is probable cause to believe that JAMES WODNICKI attempted to commit extortion affecting commerce, in that he attempted to obtain and obtained United States currency from another person, with that person's consent, induced under color of official right, and by the wrongful use of fear of economic harm in violation of Title 18, United States Code, Section 1951.

Craig Henderson, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this 28TH day of June 2010.

Honorable Sidney I. Schenkier
United States Magistrate Judge
Northern District of Illinois